UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TONI TOSTON,

                Plaintiff,

v.

MICHAEL THURMER, DON STRAHOTA, and CAPTAIN JOHN O'DONOVAN

                Defendants.

Case No. 10-CV-288-JPS

ORDER

      The plaintiff, Toni Toston, a state prisoner, filed a *pro se* civil rights complaint under 42 U.S.C. § 1983, alleging that his civil rights were violated during his arrest. This matter is before the court on the parties' cross-motions for summary judgment.

## SUMMARY JUDGMENT STANDARD

      "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

      A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information,

affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## FACTUAL BACKGROUND

The plaintiff, Toni Toston, has resided at Waupun Correctional Institution (WCI) at all times relevant to this action. The defendants are all Wisconsin Department of Corrections (DOC) employees who work at WCI. Michael Thurmer is the Warden, Don Strahota is the Security Director, and John O'Donovan is a Captain.

In July 2009, Correctional Officer Bradley conducted a random search of the plaintiff's cell. He found a handwritten page that listed the 10-Point Program, which is related to the Black Panther Party, as well as other contraband material. Bradley wrote Conduct Report Number 2011153 alleging that the plaintiff violated Wis. Admin. Code §§ 303.20 (Group Resistance and Petitions), 303.34 (Theft), 303.47 (Possession of Contraband - Miscellaneous), and 303.63 (Violations of Institution Policies and Procedures).

On July 20, 2009, defendant Strahota reviewed the conduct report pursuant to Wis. Admin. Code § DOC 303.67. The purpose of such a review is to promote uniformity among all institutions related to the review and classification of conduct reports and the imposition of penalties, to determine if the charges are appropriate, and to classify the conduct report as major or

minor offenses. Strahota determined that the plaintiff's conduct report was a major offense because the alleged violation created a risk of serious disruption at the institution or in the community.

Defendant O'Donovan presided over a due process hearing related to the conduct report on August 6, 2009. He found the plaintiff guilty of Wis. Admin. Code §§ DOC 303.20(3), 303.27(2)(a), and 303.63, and the disposition included 90 days of disciplinary separation. He found the plaintiff not guilty of § 303.34 (Theft).

The plaintiff filed an Appeal of Adjustment Committee or Hearing Officer's Decision, which was received by defendant Thurmer on August 25, 2009. The plaintiff also submitted letters to Thurmer dated August 25, 2009, September 22, 2009, and September 28, 2009.

On October 23, 2009, Thurmer responded to the plaintiff's appeal and returned the case to Hearing Officer O'Donovan to evaluate the evidence that the plaintiff submitted, namely that an allowed library book contained the 10-Point Program. Thurmer believed the disciplinary record should reflect consideration of these materials.

O'Donovan took into consideration that the 10-Point Program could be found in a book in the institution library. Nevertheless, on November 10, 2009, he issued his reasons for decision and evidence relied on, which stated in part:

> Also inmates are not allowed in their possession any written material that details the code of ethics or dogma of a gang not specifically authorized by this institution. The inmate points out that this material can be found in a book in the library; however the hearing officer notes that this material that was found was not in a book but hand written, taken out of context, and

> is noted as material for propaganda, education
> and recruiting of this unsanctioned group.  The
> material was in the inmate's possession and in
> this form, it was removed from the book.

(Affidavit of Michael Thurmer, Exhibit 1000, p. 51).  The decision also states, "[w]hether or not the inmate is a member of the gang is not necessarily relevant, the Inmate was in possession of the Black Panther Party material." *Id.*

The plaintiff once again appealed to Thurmer, who affirmed the finding of guilt for Wis. Admin. Code §§ DOC 303.20(3) and 303.27(2)(a).  Thurmer dismissed the charge of § DOC 303.63 because it was included in the other charges.  Thurmer affirmed the disposition of 90 days disciplinary separation.

At WCI, the Black Panther organization is considered a hate group, and they are an unsanctioned group throughout the DOC's institutions. WCI has a zero-tolerance policy towards unsanctioned group activities and gangs operating within the institutions. Gang Coordinator Bruce Muraski has seen other unsanctioned groups adopt materials from Black Panther Party literature, such as the 10-Point Program, to use in part or in whole as their rules or creed.  Muraski avers that security staff have seen many instances where gang members attempt to disguise their rules and creeds by intermingling them with such things as religious, political or legal writings and other forms of speech not commonly associated with street gangs.  As a result, it is important to review these types of writings when taken out of context and examine whether they are being used or can be used to promote or engage in unsanctioned group or gang activities.

Suppressing gang activity in DOC institutions is imperative to maintaining a safe and secure environment for staff, inmates, and visitors. Inmates who identify with gangs pose a serious threat to a correctional institution because such activity can contribute to the erosion of authority and lead to prison disturbances, which can put the inmates, staff and community at risk. Any inmate who possesses gang-related literature, creed, symbols or symbolism is guilty of an offense, and an inmate's possession of such items violates Wis. Admin. Code § DOC 303.20(3). The plaintiff has been identified by DOC security staff as a member of a gang and, consistent with policy, his ID card is stamped with a G. The plaintiff disputes any gang affiliation and avers that he is now a Muslim and has been since 2005.

The WCI library contains books related to the Black Panther Party, some of which contain the 10-Point Program in printed form, and those books are allowed to be checked out by inmates. However, inmates may not take the 10-Point Program out of context in a printed book and have possession of it. Not all WCI staff would recognize the list as a security threat or unsanctioned group material. For example, staff working in the WCI library might allow an inmate to make a photocopy of the 10-Point Program, not realizing that it is a security concern. Nevertheless, if an inmate were found to have such a copy or copies, it would be considered a violation under Wis. Admin. Code § DOC 303.20.

## DISCUSSION

At screening, the plaintiff was granted leave to proceed on First Amendment claims against defendants O'Donovan, Thurmer, and Strahota in their individual capacities, as well as a claim against each of the defendants in his official capacity challenging the policy (or lack thereof) under which the plaintiff's handwritten copy of the Black Panther Party 10-Point Program

was seized. The plaintiff also was allowed to proceed on an equal protection claim, but he has confirmed his abandonment of that claim and conceded that the defendants are entitled to summary judgment on that claim.

The plaintiff argues the he is entitled to summary judgment because his First Amendment rights were violated when the defendants confiscated his handwritten copy of the 10-Point Program and punished him for possessing it. According to the plaintiff, the defendants' differentiation is inconsistent. He asks how he could know that a copy of content from a library book could be contraband and how possession of it may subject him to serious disciplinary action.

The defendants also submit that they are entitled to summary judgment. They maintain that the denial of the plaintiff's copy of the 10-Point Program was reasonably related to institution security interests. They suggest that it is the nature of the plaintiff's copy (that it was hand-written and taken out of context) that differentiates it from the copies that can be found in books in the prison library. Accordingly, the defendants submit that the confiscation of the plaintiff's hand-written copy of the 10-Point Program was reasonably related to legitimate penological interests. They also contend that the defendants are entitled to qualified immunity on the plaintiff's individual claims against them and seek to limit the plaintiff's damages. Because the court will grant summary judgment to the defendants as to the First Amendment claim, it need not address the issues of qualified immunity and damages.

I. FIRST AMENDMENT

Prison officials violate the First Amendment when, for reasons unrelated to legitimate penological interests, they engage in censorship of expression of inflammatory political, racial, religious or other views.

*Procunier v. Martinez*, 416 U.S. 396, 415 (1974). "When a prison regulation restricts a prisoner's First Amendment right to free speech, it is valid only if it is reasonably related to legitimate penological interests." *Lindell v. Frank*, 377 F.3d 655, 657 (7th Cir. 2004) (citations omitted).

In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court recognized that imprisonment does not automatically deprive a prisoner of certain important constitutional protections, including those of the First Amendment. At the same time, the Constitution sometimes permits greater restriction of such rights in a prison than it would allow elsewhere. *Id.* at 84-85. Restrictive prison regulations are permissible if they are "reasonably related" to legitimate penological interests and are not an "exaggerated response" to such objectives. *Id.* at 87. *Turner* sets forth four factors to be considered in determining the reasonableness of the regulation at issue: (1) is there a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it; (2) are there "alternative means of exercising the right that remain open to prison inmates"; (3) what "impact" will "accommodations of the asserted constitutional right . . . have on guards and other inmates, and on the allocation of prison resources generally"; and (4) are "ready alternatives" for furthering the governmental interest available? *Id.* at 89-90.

Inmates like the plaintiff who challenge the reasonableness of a prison regulation bear the burden of proving its invalidity. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). The court accords "substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Id.*

The central question is whether the regulation, or the official's application of it, has a reasonable relationship to the stated goal. The plaintiff suggests that the denial of his copy of the 10-Point Program was not reasonably related to legitimate penological interests because the same 10-Point Program can be found in books allowed at WCI and even stocked in the WCI library for inmates to check out. He questions how a prisoner is expected to know that he might be subject to discipline for possession of a handwritten transcription or photocopy of content that is allowed and available in books in the prison library.

The defendants cite security concerns and the serious problems posted by unsanctioned groups and gangs in prison. They also reference past instances of such groups and gangs using unrelated material for recruiting purposes and/or to constitute their rules, creed, or bylaws. They suggest that the lack of context and the portable (and passable) nature of the handwritten version of the 10-Point Program made the plaintiff's copy susceptible to such use.

The court begins with the first of the *Turner* factors, which acts as a threshold matter "regardless which way it cuts." *Woods v. Comm. of the Indiana Dept. of Corr.*, __ F.3d __, 2011 WL 2857988, *2 (7th Cir., Jul. 19, 2011) (quoting *Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010)). "[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Woods*, 2011 WL 2857988, *2 (quoting *Turner*, 482 U.S. at 89-90).

With the material facts not in dispute, the court agrees there is a valid, rational connection between the regulation and the governmental interest. Here, the goal of maintaining security in a penal institution is clearly a legitimate interest. The regulation in question, forbidding possession of

gang-related or similar materials, is also valid and rationally connected to that interest. Because past experience shows that gangs and other unsanctioned groups sometimes use materials such as the 10-Point Program for recruiting or similar purposes, prohibiting possession of such materials – at least in an easily passable format – will arguably cut down on the ability of gangs or unsanctioned groups to organize and act in ways that place guards and inmates in danger. Thus, prohibition of such materials is valid and rationally connected to the government's security interest.

Next, the court looks to whether the plaintiff has alternative means of exercising his right. The plaintiff has access to the 10-Point Program through library books, and defendants do not dispute that inmates may check these materials out without violating prison regulations. What's more, if the plaintiff is truly an advocate of the Platform, he is free to speak to others about it, to put down his political beliefs on paper, and to urge others to likewise read or check out the books containing the 10-Point Program. Thus, it is clear that the plaintiff retains alternative means of exercising his right.

Regarding the third factor, if institutions are forced to allow inmates to possess handwritten or otherwise easily portable copies of the 10-Point Program, the burden it would place on maintaining security would be significant. In deference to the judgment of prison administrators, it appears clear that allowing inmates to possess portable copies of literature, creeds, or symbols related to unsanctioned groups will in turn allow such groups to more easily recruit and enforce their ideals, thereby decreasing the safety of both guards and other inmates.

Finally, the burden of proving the invalidity of the regulation is on the plaintiff, and here the plaintiff has not pointed to any ready alternatives that would further the security interest at issue. In fact, it is hard to imagine an

alternative to prohibiting possession of portable copies of the 10-Point Program that would accommodate the plaintiff's right at a *de minimis* cost to the security interest.

In response, the plaintiff argues that the defendants have not actually provided evidence to establish that he had taken steps to create a Black Panther organization or otherwise organized an unsanctioned group of inmates, but that is not relevant. Prison officials need not show that an inmate violating an otherwise valid regulation has intended to take action antithetical to the legitimate government interest at issue; the test under *Turner* does not so require, and the plaintiff has not pointed to any case law so requiring.

The plaintiff's other arguments focus primarily on the distinction between the availability of the 10-Point Program in a book that may be checked out as opposed to a handwritten or other portable form of the Program. While the plaintiff argues the distinction is arbitrary, in the experience and judgment of prison administrators, that distinction is in fact very important, and the court defers to that expertise. A checked-out library book is not easily passed around to other potential gang members or recruits; a handwritten copy of the 10-Point Program is. While an inmate could easily urge other inmates to go and read the Program in the library, or check the book out, that is also a far less effective recruiting and organizing tool.

The plaintiff appeals to cases supposedly establishing the arbitrariness of making a distinction between an available document and a transcribed form of the same, but those cases are all inapposite. In one, the Seventh Circuit noted in dicta that security could not be invoked as a reason for turning away a publication ordered by an inmate that prisoners may otherwise read in the library, and which may be copied for use in their cell.

*George v. Smith*, 507 F.3d 605, 608 (7th Cir. 2007). However, that conclusion turns on the fact that inmates would be *otherwise permitted to copy and retain the material. Id.* Inmates are *not* permitted to copy the 10-Point Program under the regulation at issue here. In a district court case from 1973, the court did indeed hold that punishment for simply possessing the 10-Point Program was unlawful, but that case not only failed to discuss whether there was any regulation under which the prison officials acted, as there was here, *Larkins v. Oswald*, 364 F. Supp. 1374 (W.D.N.Y. 1973), but it should also be noted that the Black Panther Party was formed in 1966 and existed in that form until the 1980s. Thus, when the court decided that case in 1973, the Black Panther Party was at least more relevant as a political movement. That is not to say that the ideals of the Black Panther Party do not remain potentially positive aspirations today, but much has developed since the 1970s to suggest, as the prison officials do here, that passable copies of the 10-Point Program have served as gang-recruitment and organization materials in modern prisons. Another case the plaintiff cites was decided within the context of Due Process, and thus has no relevance to whether the application of the regulation here violated the plaintiff's First Amendment rights. *Rios v. Lane*, 812 F.2d 1032, 1038 (7th Cir. 1987).

In sum, the four *Turner* factors all fall in favor of the defendants, and looking at them in totality, the court is convinced that the regulation here, both as written and as applied to the plaintiff, is reasonably related to the institution's legitimate interest in maintaining security.

Accordingly,

IT IS ORDERED that the plaintiff's motion for summary judgment (Docket #21) be and the same is hereby DENIED; and

IT IS FURTHER ORDERED that the defendants' cross-motion for summary judgment (Docket #28) be and the same is hereby GRANTED and this case is hereby DISMISSED.

The clerk of court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 20th day of September, 2011.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge